# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2012

## STATE OF TENNESSEE v. CURTIS STANTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-02061     Chris Craft, Judge**

---

**No. W2012-00568-CCA-R3-CD  - Filed March 27, 2013**

---

A Shelby County Criminal Court Jury convicted the appellant, Curtis Stanton, of the first degree premeditated murder of the victim, Regina Tidwell.  The trial court sentenced the appellant to life imprisonment in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

William Yonkowski (at trial), and Stephen Bush, Barry W. Kuhn, and Harry E. Sayle, III, (on appeal), Memphis, Tennessee, for the appellant, Curtis Stanton.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris West and Jeff Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, Eddie Cowan, a friend of the victim, testified that he had known the victim for approximately twenty years.  He knew the appellant because of his relationship with the victim.  Cowan believed they were still dating in September 2008.  Cowan said that one evening a couple of days prior to the victim's death, the appellant came to Cowan's apartment in Wesley Forest, which was across from the victim's apartment.  The men sat on the couch, and the appellant told Cowan that he cared for the victim and that "if he can't have

her, can't nobody have her." The appellant asked Cowan to walk with him to the victim's apartment, but Cowan refused. Cowan watched the appellant walk across the walkway to the victim's apartment and knock on the door. No one answered the door, and the appellant left. Cowan noticed that the appellant had a knife in his back pocket.

Falanda Coley testified that she was the victim's best friend. The two women had agreed to meet at Club Lucille on the evening of September 12, 2008. Coley arrived at the club around 8:30 p.m., and the victim was already there. Afterward, Coley saw the appellant enter the club. He acted agitated and paced for a while before coming to the table where Coley was sitting; the victim was in the restroom at the time. When the victim returned to the table, the appellant sat in a chair beside her and tried to talk to her. The victim stared straight ahead and did not look at or speak to the appellant. Between 1:30 and 2:00 a.m., the victim stood and told Coley that she was leaving and that she would see her the next day. The appellant left at the same time as the victim. Coley recalled that the appellant was wearing a green and white striped shirt, a green headband, jean shorts, and green and white Nike tennis shoes.

On cross-examination, Coley said that the club was not very large and that approximately forty people were there that night. She recalled that the victim was drinking beer but that the appellant did not drink any alcohol.

Lee White, Coley's husband, testified that on the night of September 12, 2008, he was working at Club Lucille as security and as a disk jockey. White said that the victim and the appellant had previously dated but were not dating at that time. When White arrived at work, the victim was in the club and appeared to be enjoying herself. However, after the appellant arrived, the victim acted as if she no longer wanted to be there. White saw the appellant try to engage the victim in conversation, but the victim sat very still, looked straight ahead, and did not speak. White saw the victim leave between 1:30 and 2:00 a.m., and the appellant left at the same time. However, they did not leave together. The victim told White that she would see him the following day. She got into her car and drove away, and the victim followed her in his car. White said the appellant was wearing a green headband, a green shirt, blue jean shorts, and green and white tennis shoes.

The victim's son, Laterrance Tidwell, testified that the appellant was the victim's ex-boyfriend and that they had dated approximately one year. Tidwell said that on Friday, September 12, 2008, the victim took Tidwell and his brother for a haircut. When they arrived at the barbershop, the appellant was there getting a haircut. The appellant walked over to Tidwell and asked where they were going after they left the barbershop. Tidwell responded that they would probably go to Westwood to visit his grandmother, Kira Tidwell.

-2-

Tidwell stated that when they left the barbershop, the victim and the appellant "ha[d] little words." Tidwell was sitting in the car with the windows rolled up and did not hear what was said. Afterward, they drove to the victim's mother's house in Westwood. When they arrived, the appellant's car was already there. Tidwell said that after they left Westwood, they returned home.

Tidwell stated that at approximately 9:00 p.m., the victim left to go to the club. She was wearing a "black muscle shirt" and plaid shorts, and she was carrying a purse. Around midnight, the appellant called three times and asked if the victim had "made it in." Tidwell responded no. Tidwell said that after the third call, he went to sleep. The next morning, he looked out the window and saw the victim's car, but she was not inside the apartment. Tidwell went outside and found the victim lying next to the apartment. Her throat had been slit, and she was covered with blood. Tidwell immediately called the police.

Cecilia May Fitch testified that shortly after 3:00 a.m. on the morning of September 13, 2008, she telephoned the appellant and asked him to come to the Betty Boo Club so he could drive her home. The appellant arrived about ten or fifteen minutes later. Fitch lived approximately fifteen minutes away from the club, and, during the drive, the appellant talked about the victim. Fitch said that she did not know who the victim was. When they arrived at Fitch's house, the appellant came in and stayed five or ten minutes. The following day, the appellant left a voice message for Fitch, asking her to tell anyone who contacted her that he had been with her all night.

Memphis Police Officer Essica Cage-Littlejohn testified that on September 13, 2008, she reported to the Wesley Forest Apartments following a missing person's report. When she arrived, a teenage boy, Tidwell, approached her and said that his mother was dead and was lying behind the building. She removed Tidwell from the area and began gathering information for her report.

On cross-examination, Officer Cage-Littlejohn said that she did not see any indication that the body had been dragged. However, she explained that she did not specifically look for drag marks.

Memphis Police Sergeant Vivian Murray testified that the appellant called the police to turn himself in and that officers brought him to the police station. After he arrived, Sergeant Murray interviewed him. Before the interview, she advised the appellant of his Miranda rights, and the appellant signed a waiver of rights form with the name "Curtis Greer." She ensured that the appellant could read by having him read the waiver form aloud. Sergeant Murray said that the appellant never said that he did not want to talk or that he wanted an attorney. Sergeant Murray noticed nothing unusual about the appellant's

demeanor, noting that he did not seem intoxicated or give an indication that he did not understand anything. The appellant never mentioned having any psychological issues.

After the appellant agreed to give the statement, he said that the victim's sister had introduced him to the victim. Although the victim was married to Lataurus Peppers, the appellant and the victim dated intermittently for approximately two years. The appellant said that he had a good relationship with the victim's three children. At the time of the offense, the victim had ended their relationship because the appellant was unemployed and because his mother and the victim did not get along.

The appellant said that between 11:00 a.m. and 12:00 p.m. on Friday, September 12, 2008, he called the victim to ask if she was going to Club Lucille's that night. The victim said no. Around 8:00 p.m., the appellant called the victim's house and asked her son where the victim was. After the call, the appellant assumed the victim was at the club. He drove to the club, saw the victim's white 2000 Mitsubishi Mirage in the parking lot, and returned home to change clothes. He put on blue shorts with a brown deer and green designs on the back, a green t-shirt followed by a white t-shirt with skulls on it, a green NBA headband, and green and white Nike tennis shoes.

The appellant said that he returned to the club at approximately 11:00 p.m. The victim was at the club and was wearing a plaid skirt, a black shirt, and flip flops. The victim asked why the appellant was there, and he responded that it was "a free country." The appellant said that he thought the victim "had a little attitude." He asked the victim to dance, and she refused. The appellant said, "That's when I first started hearing voices in my head telling me to kill her. I guess it just stuck with me." The appellant said that he sat and talked with the victim and Coley. At approximately 1:15 a.m., the victim started feeling "a little drunk," and she and the appellant walked out to the parking lot. The appellant offered to follow the victim home, but she refused. The appellant said, "I trailed her home anyway."

The appellant said that when they arrived at the victim's residence, he parked beside her car. He said that he habitually carried a kitchen steak knife in the pocket of his car door and that he took the knife from the door and put it in the front of his pants. When the victim got out of her car and walked toward her residence, he followed her and asked her to talk with him. She responded that she needed to use the restroom. The appellant said, "Then, the demons took possession, so I grabbed her with both hands and drug her around behind the apartment." He threw the victim on the ground, straddled her, and stabbed her in the throat. The victim reached for the knife, scratched the appellant's face, and tried to grab his headband. The appellant said that he stabbed the victim four or five times in the face, chest, and stomach. When the victim stopped moving and appeared to be dead, the appellant grabbed her purse from the grass, got into his car, and left.

The appellant said that after he left, he went to the Wolf River on Bellevue and Chelsea where he discarded the victim's purse, his shirt, his headband, and the knife. He went home, washed off the blood, and went to Club Hughes on Firestone to pick up a girl named Cee Cee. He took Cee Cee to her house and stayed for about fifteen minutes. The appellant left, got gas for his car, and went home. When he arrived, his mother told him that the victim's children had called at approximately 4:25 a.m. Around 6:00 or 6:30 a.m., the appellant called the victim's children and asked if the victim had gotten home. At approximately 7:00 a.m., Peppers called the appellant to say that the victim was dead. The appellant asked what happened, and Peppers responded, "[Y]ou know," and hung up on the appellant. The appellant repeatedly tried to call the victim's house, but each time, the person who answered the telephone hung up. Thereafter, the appellant decided to turn himself in to the police.

Sergeant Murray stated that she and the appellant had conversed for about five hours prior to the statement. During the conversation, the appellant initially denied any involvement in the victim's death and tried to establish that he was elsewhere. Sergeant Murray said that the first time the appellant mentioned demons or hearing voices was during the statement.

On cross-examination, Sergeant Murray stated that the appellant had called police dispatch to turn himself in and that officers met him at his location to bring him into the station. She said the interview with the appellant took place in the interview room at the homicide bureau. She said it was a large room with no windows. The appellant was not handcuffed, but he was wearing a leg iron that was attached to the bench where he was sitting. The appellant did not ask for an attorney and was pleasant, calm, and courteous during the interview. Sergeant Murray said that the crime was committed in the early morning hours and that the appellant turned himself in around 3:00 p.m. the same day.

Lieutenant Bart Ragland testified that he and Sergeant Davison went to a heavily wooded area around Levy Road near Interstate 240 and found the victim's brown purse, including some of its contents; a knife believed to be the murder weapon; and a green NBA headband that matched the description of the one the appellant said he was wearing on the night of September 12, 2008. Lieutenant Ragland said that white medical tape was wrapped around the knife and that there were initials on the handle.

On cross-examination, Lieutenant Ragland acknowledged that he went to the area because the appellant told the police where the evidence could be found. Lieutenant Ragland said that the purse was located at least twenty or thirty yards from the road. He recalled the initials "TVL" being on the knife.

Memphis Police Officer James K. Smith testified that on September 13, 2008, Lieutenant Ragland called him to work as a crime scene officer at Levy and Interstate 240. He said that he collected a purse, a green NBA headband, and a knife with tape around the handle. Officer Smith said that the area had thick vegetation, including green vines and weeds. He recalled that the purse and the headband were found fairly close to each other and that the knife was found several feet away.

Dr. Lisa Funte, a medical examiner with the Shelby County Regional Forensics Center, testified that she performed an autopsy on the victim. She said that the victim's death was caused by multiple sharp force injuries. Dr. Funte stated that the victim suffered ten stab wounds and a minimum of thirty-five incised wounds. The wounds were on the victim's face, neck, shoulders, chest, arms, hands, and legs. Dr. Funte specifically noted that the victim had been stabbed in her left cheek and her nose, "breaking the bones of the nasal cavity and the face." She said the wound would have been quite painful. The victim had defensive wounds to her hands and forearms. Dr. Funte noticed that the incised wounds on the upper left chest had a pattern that was characteristic of wounds made with a serrated blade. She also found multiple blunt force injuries and indications of manual strangulation. Dr. Funte found two potentially fatal wounds. Specifically, there was a stab wound to the left of the victim's neck, which cut the left carotid artery, caused profuse bleeding, and would have led to the victim's death within a few minutes. There was also a stab wound to the right side of the victim's chest, which penetrated the chest wall, diaphragm, and liver. Dr. Funte noted that there was little hemorrhaging at the site of the liver stab wound, which indicated a loss of blood pressure at the time the wound was inflicted. Because of the lack of blood pressure at the time the liver was stabbed, Dr. Funte opined that the carotid artery was stabbed first.

After the State rested its case-in-chief, Dr. Joseph Charles Angelillo, a clinical and forensic psychologist, testified as a defense witness. He said that he met with the appellant on five occasions in 2010, spending three and a half hours interviewing and nine to ten hours testing him. Dr. Angelillo saw no evidence that appellant was malingering. As a result of the tests, Dr. Angelillo determined that the appellant, who had an IQ of 65, suffered from "very significant anxiety" and that, under stress, the anxiety would bring on confusion, lack of organization, and "border[] on if not reach[] delusional thinking." He also found the appellant had symptoms of post-traumatic stress disorder (PTSD), but he could not say that the PTSD preexisted the killing.

Dr. Angelillo said that at first, the appellant did not understand why he was being evaluated. During the evaluation process, the appellant was cooperative, friendly, and receptive. The appellant gave his account of the events in a coherent and calm manner. Dr. Angelillo estimated that the appellant functioned at a level between the first and fifth grades.

He said that the appellant's cognitive abilities did not affect his ability to tell the truth or to lie. He stated that none of the appellant's mental or psychological problems would make him behave impulsively. Dr. Angelillo said, "[I]t doesn't take much for him to go from a low point of stress and controlled behavior to disorganized thinking and in fact at those times, he may be much more prone to act without giving it much thought." Therefore, he opined that the appellant was incapable of premeditating. He said, however, that the appellant was able to tell the difference between right and wrong and knew that what he was doing was wrong when he killed the victim.

On cross-examination, Dr. Angelillo conceded that the appellant had no history of mental health issues or treatment. The appellant told Dr. Angelillo that he heard voices on only one occasion, which was just prior to killing the victim. The appellant had held a number of different jobs and attended high school until the eleventh grade.

Dr. Angelillo said that the appellant's PTSD could have been triggered by killing the victim. He acknowledged that "even an elementary school child can form a plan of action." Dr. Angelillo concluded that the appellant felt rejected, angry, and helpless and that his actions toward the victim were a result of his attempt to regain the relationship or to regain the appearance of control. Dr. Angelillo acknowledged that in his report he wrote, "[W]hat in my opinion appears to be the most important is the purpose that appeared to be served, that is this purpose appeared to create or at least solidify a previously thought of plan of action."

On redirect examination, Dr. Angelillo said that the appellant had "symptoms that satisfied the diagnosis [of generalized anxiety disorder] on a rule out basis. And I stress rule out." He said that generalized anxiety disorder alone would not necessarily render someone incapable of premeditation but that, "along with other things," the diagnosis led him to conclude that the appellant was incapable of premeditation.

Dr. Angelillo acknowledged the appellant said that a demon took hold of him and that he heard voices telling him to kill the victim. However, Dr. Angelillo said that he did not think the appellant was suffering from a hallucination or that the appellant "literally [heard] a voice saying do this." Instead, the appellant likely had a thought that repeated itself until it may have become an obsession.

On recross examination, Dr. Angelillo said that the appellant heard a voice once but that "this group of thoughts was not just a one time deal." He explained that the group of thoughts could have originated from the appellant's idea that he could not live without the victim.

The jury convicted the appellant of first degree premeditated murder, and the trial

court sentenced the appellant to life imprisonment with the possibility of parole. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The appellant argues that the proof demonstrates that he did not act with premeditation. Specifically, he notes that in his statement to police, he said that he killed the victim after demons took hold of him and after he heard voices telling him to kill her. He

also notes that Dr. Angelillo opined the appellant was incapable of forming the intent to kill. The State contends that there was sufficient evidence to indicate that the appellant acted with judgment and reflection and that he met all of the foregoing Pike factors from which a jury could infer premeditation. We agree with the State.

In the light most favorable to the State, the proof at trial reflected that a couple of days prior to the killing, the appellant told Cowan that if the appellant could not have the victim, no one could. Then, the appellant, who had a knife in his back pocket, went to the victim's apartment, but he left when no one was home. On the day of the killing, the appellant called the victim to learn where she planned to be that evening, but she would not tell him. The appellant encountered the victim and her son, Tidwell, at the barbershop, and he asked Tidwell where the victim would be later that day. He then followed her and her family to her mother's house. Thereafter, the appellant called the victim's children to learn her whereabouts. He drove by the club, saw the victim's car, went home to change clothes, and went into the club to see the victim. Coley and White testified that while in the club, the victim acted as if she did not want to talk to the appellant, despite his continued attempts to engage her in conversation. In his statement, the appellant said that he started thinking about killing the victim after she "had a little attitude" and refused to dance with him. The appellant followed the victim home, although she expressed her desire for him to not follow her. At the victim's residence, the appellant took a steak knife from his car and approached the victim. The appellant said that after the victim refused to talk to him, he dragged the victim behind the apartment building and stabbed her repeatedly. Afterward, the appellant left and went to the Wolf River area where he discarded evidence of the crime, including the victim's purse, his shirt, his headband, and the knife. Later, the appellant called the victim's house and asked her children if she had gotten home. He also asked Fitch to say that he was with her the entire evening of the killing. We conclude that a reasonable jury could have rejected the defense theory that the appellant could not form the requisite intent and that he killed the victim intentionally and with premeditation. See State v. Suttles, 30 S.W.3d 252, 261-62 (Tenn. 2000); State v. David Plunk, No. W2000-00526-CCA-R3-CD, 2001 WL 204182, at *5 (Tenn. Crim. App. at Jackson, Feb. 26, 2001).

### III.  Conclusion

In sum, we conclude that there was sufficient evidence to sustain the appellant's conviction for first degree premeditated murder. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE